UNITED STATES, Appellee

v

STEPHEN J. BORYS, Captain,
U. S. Army, Appellant

18 USCMA 547, 40 CMR 259

No. 21,501

September 5, 1969

*George W. Latimer, Esquire,* argued the cause for Appellant, Accused. With him on the brief were *Calvin A. Behle, Esquire, Lieutenant Colonel Martin S. Drucker,* and *Major David J. Passamaneck.*

*Captain Larry S. Seuferer* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel David Rarick, Major Edwin P. Wasinger,* and *Captain William R. Steinmetz.*

## Opinion of the Court

FERGUSON, Judge:

In this case, we are confronted with the question of the validity of accused's conviction by general court-martial in Georgia, in light of the Supreme Court's recent decision in O'Callahan v Parker, 395 US 258, 23 L Ed 2d 291, 89 S Ct 1683 (1969).

The offenses with which we are here concerned all occurred off-post in the civilian homes of the victims, located variously in Augusta, Georgia; North Augusta, South Carolina; and Aiken, South Carolina. They occurred during accused's off-duty hours or when he was on leave, involved purely civilian female victims, and constituted rape, robbery, sodomy, and attempts to commit such acts, all such crimes being civil in nature. The accused was described as wearing civilian clothing, and the vehicle which he used—and

**547**

which eventually led to his apprehension—was his own private automobile. The sole mention of any military matter in the case was a bumper sticker which served to help in his identification and apprehension. Indeed, he was initially arrested by civilian authorities, removed to South Carolina and tried in Aiken for some of his atrocious crimes. He was acquitted, and it was apparently only after this civilian judicial action that the Army saw fit to hale him before a general court-martial.

The question presented by these facts is simply whether an accused may be tried by court-martial for civil crimes committed in the United States against the civilian community when the local courts are open and functioning. O'Callahan v Parker, supra, would seem to provide the answer—an emphatic "No," unless such crimes are military-connected, a test which we all agree cannot be met in this case.

O'Callahan was a soldier stationed in Hawaii. While on pass in Honolulu and while dressed in civilian clothing, he broke into a hotel room and attempted to rape a young girl. Apprehended by a hotel security officer and turned over to city police, he was subsequently released to military authorities. Thereafter, he was brought to trial before a general court-martial upon charges of attempted rape, housebreaking, and assault with intent to commit rape, in violation of Uniform Code of Military Justice, Articles 80, 130 and 134, 10 USC §§ 880, 930, 934. He was ultimately convicted, sentenced, and exhausted his appellate remedies. Thereafter, he sought release by habeas corpus upon the contention the court-martial had no jurisdiction to try him upon the charges before it. The District Court denied relief; the Circuit Court of Appeals affirmed; and the Supreme Court granted certiorari upon the issue whether a court-martial had jurisdiction to try an accused charged with " 'commission of a crime cognizable in a civilian court and having no military significance, alleged to have been committed off-post and while on leave, thus depriving him of his con-

stitutional rights to indictment by grand jury and trial by a petit jury in a civilian court.' " O'Callahan, supra, at page 261. The Court determined that such offenses were not triable by court-martial unless military-connected, rejecting the argument of the Government that one's military status was a sufficient predicate to establish jurisdiction to try misconduct of a civil nature. Its clear language is worthy of note. Thus it declared, at page 265:

"That a system of specialized military courts, proceeding by practices different from those obtaining in the regular courts and in general less favorable to defendants is necessary to an effective national defense establishment, few would deny. But the justification for such a system rests on the special needs of the military, and history teaches that expansion of military discipline beyond its proper domain carries with it a threat to liberty."

The Court quoted with approval Toth v Quarles, 350 US 11, 22, 100 L Ed 8, 76 S Ct 1 (1955), wherein it noted that "Free countries . . . have tried to restrict military tribunals to the narrowest jurisdiction deemed absolutely essential to maintaining discipline among troops in active service . . . . the 'least possible power adequate to the end proposed.' "

It then reviewed the history of Anglo-Saxon military jurisdiction, pointing out the traditional limitation to purely military offenses, denying at all times any general jurisdiction over ordinary crimes, until at last, in 1916, Congress extended the military trial power to cover certain specified civil crimes, even in peacetime, and, finally, in 1950, to cover all crimes. The Court's language in O'Callahan, supra, indelibly returned military law to its earlier limited scope, when it summed up by stating, at page 272:

"We have concluded that the crime to be under military jurisdiction must be service connected, lest 'cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public

danger,' as used in the Fifth Amendment, be expanded to deprive every member of the armed services of the benefits of an indictment by a grand jury and a trial by a jury of his peers."

In finding no service-connection to O'Callahan's sexual assault and attendant housebreaking, the Court pointed out they were not committed on a military post; nor did his victim have any military duties; nor was the situs of the crime "an armed camp under military control, as are some of our far-flung outposts." Finally, it adverted to the fact Hawaii's courts were open, the crimes committed in our territorial limits, and that there was no flouting of military authority, breach of military security, or violation of the integrity of military property. *Id.*, at page 273. In short, the offenses were not "service connected."

How, then, do the accused's delicts compare with those of O'Callahan? They, too, involved civilian victims, unconnected with the military. Neither Georgia nor South Carolina were armed camps or far-flung military outposts under Army control. Accused's horrible acts, like those of O'Callahan, did not flout military authority, breach military security, or affect military property. In fact, he himself did not even reside on post, but lived among the civilian community on which he preyed. Finally, the courts of South Carolina and Georgia were not only open and functioning, but resort to the former's facilities led only to accused's acquittal.

In sum, accused's military status was only a happenstance of chosen livelihood, having nothing to do with his vicious and depraved conduct, and none of his acts were "service connected" under any test or standard set out by the Supreme Court. In short, they, like O'Callahan's, were the very sort remanded to the appropriate civil jurisdiction in which indictment by grand jury and trial by petit jury could be afforded the defendant.

The dissenting opinion, however, declares *O'Callahan* lays down a bifur-

cated test. In addition to service-connection, it finds the offense must be triable in a Federal court to escape the application of the limitations set forth by the Supreme Court. Not a single statement in *O'Callahan,* supra, supports that conclusion. The grant of certiorari itself refers to crimes cognizable " 'in a *civilian court'* " and accused's right to " 'trial by a petit jury in a *civilian* court,' " *id.,* page 261; the opinion adverts to the practices "obtaining in the *regular* courts," *id.,* page 265; to a *"civilian* trial," *id.,* page 266; to "the 'Ordinary Process of Law,' " *id.,* page 269; to *"civil,* not military, courts," *id.,* page 270; to "trials . . . in *civil* courts," *id.,* page 271; and to the "[c]*ivil* courts" as being open, *id.,* at page 273 (emphasis supplied). Finally, the Court decided that, "since petitioner's crimes *were not service connected,* he could not be tried by court-martial but rather was entitled to trial *by the civilian courts." Id.,* at page 274. (Emphasis supplied.)

Moreover, the authorities on which the Court relied to reach its decision, speak only in terms of *civilian* vis-à-vis *military* trials. See Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, pages 723–725, and Duke and Vogel, The Constitution and the Standing Army: Another Problem of Court-Martial Jurisdiction, 13 Vanderbilt Law Review 435 (1960). In short, as Winthrop notes, "A crime, therefore, to be cognizable by a court-martial under this Article, must have been committed under such circumstances as to have directly offended against the government and discipline of the military state." The test is, in every case, whether the accused's offense is service-connected. Otherwise he is to be relegated to the civil authorities, then to be indicted and tried in accordance with the law of the land rather than to be subjected to *military disciplinary procedures.*

We conclude, therefore, that O'Callahan v Parker, supra, requires us to set aside the findings of guilty and sentence and order the charges dismissed, relegating accused's case to such action

as the State of Georgia may wish to take in light of his alleged transgressions.

The decision of the board of review is reversed, and the record of trial is returned to the Judge Advocate General of the Army. The charges are ordered dismissed.

Judge DARDEN concurs.

QUINN, Chief Judge (dissenting):

Decisions of the Supreme Court of the United States interpreting the Constitution are binding upon this Court. The interpretive process, however, is a process of reasoning, not mechanics, and the result of reasoning often depends upon the initial premise. The accumulated wisdom and literature of legislative and legal opinion are, I believe, opposed to the reasoning in O'Callahan v Parker, 395 US 258, 23 L Ed 2d 291, 89 S Ct 1683 (1969). For the purpose of this case, I am constrained to accept its premise and its conclusion, but I hope that the searching criticism of the bench and bar may, as it has on other occasions, convince a new or future majority of the Supreme Court of the error of O'Callahan. See Quinn, The Role of Criticism in the Development of Law, 27–100–35 Military Law Review 47 (1967).

Elsewhere, I observed that judges "are not free from imperfections" and they "can and do make mistakes." Quinn, The United States Court of Military Appeals and Individual Rights in the Military Service, 35 Notre Dame Lawyer 491, 507 (1960). I have looked askance at what I regard, rightly or wrongly, as the incontinent disorder of some of the constitutional opinions of the justice who authored the O'Callahan opinion, yet I believe that not even he would, by mere *ipse dixit*, deny Congress its power to govern the

armed forces. More importantly, I do not believe that the other justices of the Supreme Court who constituted the majority contemplated the results my brothers now conceive as mandated by the opinion.

To me, O'Callahan cannot be read with the literalness of a first grade primer. The decision involves a complex compound of principles of law that yields meaning only when each principle is separated from the others and applied to an ever-narrowing set of circumstances. I read O'Callahan, therefore, not by rote, but in light of the experience and reason of nearly two hundred years of American Government.

As I read the O'Callahan opinion, two factors must conjoin to effect the constitutional restriction on the exercise by Congress of its power to govern the armed forces. These are: (1) The act of misconduct defined by Congress as a crime for the military community must be " 'cognizable in a civilian court' "; and (2) the substance or the circumstances of the crime must demonstrate the crime has " 'no military significance' " or is "not service connected." This conclusion, in my opinion, is implicit in the Court's discussion of circumstances that might impart " 'military signifiance' " to, or effect a special service connection with, the offense.

What the Supreme Court was apparently concerned with was the constitutional justification for treating a person in the military service differently from a civilian, when both commit the same criminal act. The Court determined that the military status of the wrongdoer is not alone sufficient to justify a different form of prosecution from that of the civilian for the same misconduct.[1] The Court, however, ex-

---

[1] As the dissent in O'Callahan v Parker, 395 US 258, 23 L Ed 2d 291, 89 S Ct 1683 (1969), indicates, the majority implied that a particular act of misconduct might be outside the constitutional jurisdiction of a court-martial if committed by an enlisted person but within that jurisdiction if performed by an officer. I do not construe the implication, which appears in footnote 14 of the majority opinion, as a determination that the status of an officer justifies military trial for an offense not otherwise constitutionally triable by court-martial. In this regard, I believe an officer "is not clothed

plicitly acknowledged that an offense may be committed by a military person under circumstances so different from those incident to commission of the offense by a civilian, that a difference of treatment by Congress is constitutionally permissible. See United States v Noyd, 18 USCMA 483, 40 CMR 195.

If no reasonable difference appears between the civilian and the military person in the commission of the same wrongful act, they cannot, under *O'Callahan,* be prosecuted differently. However, if the offense by the military person has " 'military significance,' " Congress can, under its constitutional power to govern the military, make him subject to trial by court-martial, although the civilian committing the same acts remains triable in a civilian court. Thus, the fact that a civilian court has cognizance of the crime does not itself prevent a military trial for the crime, but it must also appear that the crime has " 'no military significance' " or is "not service connected." As I said earlier, therefore, both factors must be present to bar trial by court-martial of a military offender.

I now turn to the operative scope of the first condition in the *O'Callahan* formulation, namely, that the prohibited act be " 'cognizable in a civilian court.' " What kind of civilian court is included in the phrase? American military forces are stationed in many foreign countries, and the laws of many of these countries proscribe as crimes acts which are also defined as crimes by the Uniform Code of Military Justice. These crimes are cognizable in the respective civilian courts of the foreign countries. Does that circumstance affect the constitutional power of Congress to govern the military and subject a military offender to trial by court-martial? The question virtually answers itself. Foreign law cannot curb the power of Congress. Consequently, I am certain the

Supreme Court intended the phrase " 'cognizable in a civilian court' " to mean cognizable in an American, not a foreign, civilian court.

American civilian courts are part of either the Federal Government or the government of a particular State. The Constitution does not confer upon a State court the power to try a crime defined by Congress; and, conversely, a Federal court has no inherent power under the Constitution to try and punish a person for violating a State criminal statute. Under the Constitution, the State and Federal Governments are different sovereign entities and, within the limits of their respective powers, each can define certain conduct as wrongful and punish a person who commits an act in violation of its laws. In fact, Congress has provided that the Federal courts "have original jurisdiction, *exclusive of the courts of the States,* of all offenses against the laws of the United States." (Emphasis supplied.) 18 USC § 3231.

Historically, the Supreme Court has recognized the separate right of the State and the Federal Governments to define and punish criminal conduct. In Abbate v United States, 359 US 187, 3 L Ed 2d 729, 79 S Ct 666 (1959), it determined, and reaffirmed a line of precedents to the effect, that the Constitution does not bar the Federal Government from prosecuting an accused for a crime in violation of Federal law, although the act is also criminal under State law and the State has already tried the accused. In Bartkus v Illinois, 359 US 121, 3 L Ed 2d 684, 79 S Ct 676, rehearing denied, 360 US 907, 3 L Ed 2d 1258, 79 S Ct 1283 (1959), it reaffirmed the constitutional right of a State to prosecute, independently, conduct violative of State law, although the same act contravened Federal law and the Federal Government has already tried the accused.

More recently, the Supreme Court has swept aside earlier precedents to

---

with any less constitutional . . . rights than is an enlisted person." United States v Johnson, 9 USCMA 442, 443, 26 CMR 222; cf. United States v Gallagher, 15 USCMA 391, 35 CMR

363. I, therefore, attach no significance to the fact that this accused is a commissioned officer, whereas O'Callahan was an enlisted man.

hold that the due process clause of the Fourteenth Amendment makes applicable to the States the Fifth Amendment prohibition against double jeopardy. Benton v Maryland, 395 US 784, 23 L Ed 2d 707, 89 S Ct — (1969). Under *Benton,* neither a State nor the Federal Government can try an accused twice for the same crime. However, nothing in *Benton,* or in *O'Callahan,* hints at rejection by the Supreme Court of the principle that all States and the Federal Government have the separate and the independent right to proscribe and punish criminal conduct in violation of their respective laws.

Applying the established doctrine. of separate sovereignty to the phrase " 'cognizable in a civilian court,' " I must conclude the Supreme Court meant that the crime must be within the jurisdiction of a civilian court that owes its existence and powers to the Federal Government, not one created by a State. See Easton v Iowa, 188 US 220, 47 L Ed 452, 23 S Ct 288 (1903).

There are fifty States in the Union. Their penal codes are not identical, either as to specific crimes or as to the punishment prescribed for the same wrongful act. Nor do the penal laws of all the States correspond to the offenses defined in the Uniform Code of Military Justice and in the Federal civilian penal code. To illustrate the difference, let us consider the offense of carnal knowledge of a female below the age of sixteen.

Carnal knowledge of a female under sixteen is prohibited by Article 120 (b), Code, supra, 10 USC § 920, and the offender is subject to confinement at hard labor for fifteen years, without regard to whether the female is of previous chaste character. Manual for Courts-Martial, United States, 1951, Table of Maximum Punishments, paragraph 127*c,* at page 223. The Federal civilian criminal code contains no direct provision prohibiting such conduct.[2] The State of Florida prohibits carnal knowledge with a female below the age of eighteen who is of previous chaste character; the State of Hawaii forbids similar conduct with a female under the age of sixteen. Let us suppose a serviceman carnally knows a female, who is fifteen years of age but not of previous chaste character, at her home in the civilian community in the State of Florida. The act is punishable under the Uniform Code of Military Justice; it is not, however, a Federal civilian crime and not an offense under the law of the State of Florida because the female is not of previous chaste character, but it would be a violation of the law of the State of Hawaii, had it been committed in that State. How does this situation fit the *O'Callahan* formula?

State criminal jurisdiction depends generally upon whether the criminal act is committed within the State or takes effect within the State. Cooley, A Treatise on the Constitutional Limitations, 4th ed., at pages 154, 155. Domicile, and perhaps residence, may provide a connection between the State and the criminal to support the State's assertion of criminal jurisdiction over the act. See Skiriotes v Florida, 313 US 69, 85 L Ed 1193, 61 S Ct 924, rehearing denied, 313 US 599, 85 L Ed 1552, 61 S Ct 1093 (1941). In our hypothetical case, the State of Hawaii has no connection with the offense or the serviceman so it could not try him for the act. It is inconceivable that the Supreme Court contemplated that the laws of Hawaii could be considered in determining whether the offense was " 'cognizable in a civilian court.' " Consequently, *O'Callahan* does not postulate that court-martial jurisdiction over an offense defined in the Uniform Code is constitutionally forbidden because there is at least one State in the Union which punishes the same act as a crime.[3]

---

[2] At this point, I am not concerned with the Federal Assimilative Crimes Act, 18 USC § 13, or with the "special maritime and territorial jurisdiction of the United States," as provided by 18 USC § 2032.

[3] Later in the text I shall consider whether Congress can constitutionally prescribe crimes for persons in the military which it cannot prescribe for the general population.

Let us suppose now that the act of carnal knowledge had not been committed in Florida but in Hawaii. Does this situation come within the constitutional limitation contemplated by *O'Callahan*?

Putting aside the congressional command of 18 USC § 3231, we can turn again to the constitutional concept of the separability and independence of the Federal and State Governments. Again, I perceive no constitutional limitation through State action on the power of Congress to govern the armed forces. Enactment by a State of a similar code of conduct for persons subject to its jurisdiction cannot affect the right of Congress to prohibit the same acts to persons in the military service.

Article VI of the Constitution provides that "the Laws of the United States" made pursuant to the provisions of the Constitution "shall be the supreme Law of the Land." *O'Callahan* casts no doubt upon the right of Congress to prescribe a criminal code for persons in the military service and to designate a Federal forum for trial of a violation of that code. The happenstance that a State court has cognizance of a State crime identical to one in the military code cannot limit the exercise of congressional power. I am impelled to the conclusion, therefore, that no State civilian court, even within the State in which the crime is committed, was intended by the Supreme Court to be included within the phrase " 'cognizable in a civilian court.' "

One civilian court remains to be considered. That court is a court that owes its existence and powers to Federal law. *O'Callahan* dealt with such a court. O'Callahan's acts were committed in the then Territory of Hawaii. The substantive law of the Territory of Hawaii and its judicial structure derived their existence from the Federal Government. See Hawaii v Mankichi, 190 US 197, 47 L Ed 1016, 23 S Ct 787 (1903); cf. Rassmussen v United States, 197 US 516, 49 L Ed 862, 25 S Ct 514 (1905). A single sovereign, the Federal Government, was the generating source of the prohibitions against the acts committed by O'Callahan, and the crimes were cognizable in a civilian court that traced its authority to the powers of the Federal Government. No question of supremacy of authority or separateness of sovereignty was present.

The problem that faced the Supreme Court in *O'Callahan* was this: In the Uniform Code of Military Justice, Congress defined particular acts as crimes when committed by persons in the military service and made these crimes triable by courts-martial; at the same time, it had authorized prohibition of the same acts in the Territory of Hawaii for the generality of the population in the territory; these offenses were triable in a civilian court of the territory. The Supreme Court concluded that Congress could not differentiate between civilians and military persons in regard to the forum of prosecution, unless the acts of misconduct had military significance or were service-connected. The problem and the solution lead inexorably to the conclusion that the Supreme Court conceived the constitutional limitation on the right of Congress to prescribe trial by court-martial for misconduct by a person subject to military law as dependent upon two inseparable conditions: (1) That the same offense is cognizable in a Federal civilian court; and (2) that the circumstances incident to commission of the crime demonstrate no " 'military significance' " in, or service-connection with, it.

This case does not fit either condition of limitation fixed by *O'Callahan*. The accused was convicted of three specifications of robbery, two specifications of rape, one specification of attempted rape, three specifications of sodomy, and one specification of attempted sodomy. All the offenses were committed outside a military reservation in South Carolina and in Georgia. None are, therefore, triable by any Federal tribunal, except as provided in the Uniform Code of Military Justice. This raises the preliminary question whether Congress, under its constitu-

tional authority to govern the armed forces, can provide a criminal code for military persons which it cannot constitutionally apply to the generality of civilians throughout the country. This question was not considered in *O'Callahan,* but must be answered here, because if the answer is in the affirmative then the first factor requisite to the bar to trial by a military court is not present.

Congress has two broad classes of powers. It has the special powers enumerated in the Constitution, such as providing for the government of the armed forces and the right to regulate interstate commerce, and it has unrestricted powers of an absolute sovereign in regard to territory subject to its exclusive control, such as the District of Columbia and certain Federal enclaves within the boundaries of the several States. As a result of this dichotomy of power, all persons within the geographic boundaries of the United States are not uniformly subject to the same Federal criminal statutes. Geography, subject matter, and status play a part in effecting this result.

Without citation to specific precedents, I think it indisputable that none of the enumerated powers of Congress would allow it to prohibit all persons within the country who are subject to the general laws of the United States from inflicting self-injury for the purpose of avoiding work or duty. I think it equally indisputable that not being limited to enumerated powers, a State may make such conduct a crime. In fact, the State of Alabama has proscribed intentional self-injury as a felony. Code of Alabama, Title 14, § 357. Considering only its special powers, Congress cannot control this kind of individual conduct for the entire population within the borders of the United States. However, in territory in which the Federal Government has exclusive jurisdiction, it can act with the plentitude of powers of a State. Hornbuckle v Toombs, 18 Wall 648 (U. S. 1874); District of Columbia v Thompson Co., 346 US 100, 97 L Ed 1480, 73 S Ct 1007 (1953). Congress

can, therefore, and in fact has, prohibited intentional self-injury, but only on a selective basis.

No general statute against intentional self-injury is applicable to all territories over which the Federal Government has exclusive jurisdiction. Instead, by means of the Federal Assimilative Crimes Act, 18 USC § 13, Congress has prohibited self-injury when committed by a person within Federal enclaves located in the State of Alabama, which appears to be the only State in the Union in which intentional self-injury is a crime. Does this singling out of one area of Federal jurisdiction, to the exclusion of all other Federal areas within the several States, constitute such unequal and unfair treatment of the persons who have occasion to enter Federal enclaves in Alabama as to preclude Federal prosecution for self-injury committed in a Federal enclave in Alabama? The Supreme Court has noted that the "Fifth Amendment contains no equal protection clause and it restrains only such discriminatory legislation by Congress as amounts to a denial of due process"; at the same time, however, it has suggested that certain kinds of unequal treatment of the general population may be constitutionally objectionable unless there is "a reasonable basis for the action." Hirabayashi v United States, 320 US 81, 100, 101, 87 L Ed 1774, 63 S Ct 1375 (1943). The Supreme Court has also sustained the constitutionality of the Federal Assimilative Crimes Act, notwithstanding the Act manifestly proscribes different criminal conduct for different Federal territories. United States v Sharpnack, 355 US 286, 2 L Ed 2d 282, 78 S Ct 291 (1958). A rational ground for the distinction exists in the desire of Congress to prevent Federal areas within a particular State from becoming privileged sanctuaries of immunity for persons engaging in conduct that is criminal in all other parts of the State. It is apparent, therefore, that, in the exercise of its constitutional power to regulate Federal territories within the several States, Congress can make criminal acts per-

formed in one territory without making the same acts criminal in Federal territory in another State.

If geography can provide the rationale for constitutionally allowable difference in legislative treatment of persons subject to Federal law, cannot the existence of a special status relationship to the Federal Government also justify a difference in treatment? To provide a factual focus for an answer I return to the act of intentional self-injury.

Congress has forbidden persons in the military service from intentionally inflicting self-injury for the purpose of avoiding work or duty. Article 115, Code, supra, 10 USC § 915. No similar prohibition applies to the generality of the population within or without Federal territories, except as the Federal Assimilative Crimes Act applies in Alabama.

The Constitution confers upon Congress the power to govern the armed forces. In spaciousness of language, the grant of power is as broad as that of the grant of power over Federal territories ceded to the Federal Government by the States. The power over the military is not merely to regulate but to "make Rules for . . . [its] *Government*" (emphasis supplied); the power over the special territories is defined as the power to "exercise exclusive Legislation." Article I, § 8, clauses 14 and 17, Constitution of the United States. On the authority of this language alone it would appear that the right of Congress to define criminal conduct for the government of the armed forces is as broad as its power to legislate for the territories, which, I pointed out earlier, is as extensive as the power of a State to define a criminal code. *O'Callahan* does not deny this authority; what it determined was that, under the Constitution, Congress cannot make the same act criminal for the military and the civilian and try each in a different kind of court, without some reasonable basis for the action. The Constitution itself, therefore, contemplates different regulation by Congress of military per-

sons from its regulation of the general population. It can prohibit conduct by a person in the military without at the same time prohibiting the act to civilians.

In my hypothesis, Congress prohibited self-injury to persons in the military. Concededly, it could have, but did not prohibit the same act to civilians within the special maritime and territorial jurisdiction of the United States. Also, it did not, and could not, prohibit the same act to civilians within the geographic boundaries of the United States but outside the Federal special territorial jurisdiction. As a result, except for the limited effect of the Federal Assimilative Crimes Act in Alabama, no civilian in the United States is subject to Federal prosecution for intentional self-injury. To the extent that the State of Alabama recognizes the offense it can be described as a civilian offense, but so far as the offense exists as a punishable Federal crime it is attributable to the power of Congress to govern the military. From that standpoint, therefore, the offense is almost exclusively military; and any place outside of Alabama it is entirely military in origin and application.

A crime that is rooted in the exercise by Congress of its constitutional power to govern the military, and which is not, or cannot be, applied by Congress to the generality of the population, has, in my opinion, inherent "'military significance.'" Nothing in *O'Callahan* is opposed to this conclusion. But, even if I err in attaching too much importance to this difference in status as justifying different treatment of a class of persons who can be punished for committing an act Congress has forbidden, the fact remains that when no Federal civilian court can take cognizance of the crime if committed by a civilian at the same place and under the same circumstances, the first condition of the prohibition against court-martial trial for the offense, as postulated in *O'Callahan*, is not present. Congress can treat that kind of case as one "arising in the land or naval forces" as provided by the Fifth

Amendment to the Constitution, and make the offense subject to trial by court-martial.

One of the wrongful acts of which accused stands convicted is proscribed directly by Congress only in the Uniform Code of Military Justice and in the District of Columbia. As a result, the generality of persons within the United States is not liable to trial and punishment in a Federal civilian court for that act, except under the provisions of the Federal Assimilative Crimes Act or when the act is committed in the District of Columbia. Since this offense was not committed in a Federal territory or enclave or in the District of Columbia, if the accused had been a civilian, he could not be tried for the act in a Federal civilian court. The offense to which I refer is sodomy.

Article 125, Code, supra, 10 USC § 925, provides that any person subject to the Uniform Code "who engages in unnatural carnal copulation . . . is guilty of sodomy" and "shall be punished as a court-martial may direct." The maximum punishment, as prescribed by the President pursuant to authority conferred by the Code, includes a dishonorable discharge and confinement at hard labor for five years. Manual for Courts-Martial, supra, Table of Maximum Punishments, paragraph 127c, section A, at page 223. Both Georgia and South Carolina, where the acts of sodomy were committed, have statutes prohibiting the same conduct. Criminal Code of Georgia, Title 26, §§ 26–5901, 26–5902 (1933) (now Title 26, § 26–2002 (1969)); Code Laws of South Carolina, Annotated, § 16–412 (1952). I have already observed, however, that mere existence of a State penal statute proscribing an act within the boundaries of the State cannot operate to divest Congress of the right to define the same act as a crime. Consequently, the fact that the respective courts of South Carolina and Georgia have cognizance of a violation of State law cannot restrict Congress in the designation of a, Federal tribunal to

try the crime defined by it. See 18 USC § 3231.

Had the accused been a civilian at the time he committed the acts of sodomy, he would not have committed a Federal crime and no Federal civilian court could have had cognizance of the crime. From the standpoint of the Federal Government, therefore, the acts of misconduct were, in the circumstances of their commission, peculiarly military. Congress could prohibit the act in the place where it was committed only in exercise of its power to govern the military. I have construed that power as being as broad as the power of the State to order the conduct of persons within its boundaries. If more military significance is needed, I believe it is present in the fact that, having undertaken to establish and maintain military forces in all parts of the country, Congress has the responsibility to so govern those forces, by the means available to it, that the members thereof will not terrorize, ravage, or otherwise victimize the civilian population. That a particular State has acted in a similar way to protect its inhabitants cannot deter Congress from providing a criminal code for the members of the armed forces. Since no Federal law can attach Federal criminal liability to these acts when committed by a civilian, it is reasonable to conclude the crime was defined by Congress, at least in part, to prevent military persons assigned to duty near towns and cities not subject to Federal territorial jurisdiction from preying upon the civilian population. I conclude that the acts of sodomy committed by the accused were outside the purview of the constitutional limitation postulated in *O'Callahan* in that they are are not and could not be "cognizable" in a Federal civilian court, and are, therefore, subject to trial by court-martial as a case "arising in the land or naval forces" within the meaning of the Fifth Amendment.

Unlike sodomy, rape and robbery of private property from a private person have been proscribed by Congress as Federal crimes when committed within the special maritime or terri-

torial jurisdiction of the United States 18 USC §§ 2031, 2111. Rape and robbery are also offenses in violation of the Uniform Code of Military Justice, Articles 120 and 122, 10 USC §§ 920 and 922, respectively. As a result, if either act is committed within the special territorial jurisdiction of the United States, the offender, whether military or civilian is liable to trial in a Federal civilian court. Thus, if the act has " 'no military significance,' " the first condition against trial by military court of the military offender, as defined in the *O'Callahan* case, is met. This situation, however, is not present here.

As with the sodomy offenses, the rape and robbery acts were committed outside the special territorial jurisdiction of the United States. If the accused had been a civilian, he would have violated no Federal civilian law and his crimes would not have been cognizable in a Federal civilian court. But the accused is not a civilian. He is a member of the armed forces and he is subject to the Uniform Code of Military Justice; his acts were violations of the Code. Unless the accused can be tried by court-martial, he cannot be prosecuted under Federal law, and the declaration by Congress of the criminality of his acts is futile and fatuous.

Some of the crimes by the accused were committed in South Carolina; others were committed in Georgia. As indicated in my previous discussion of the territorial principle of American criminal law under which the place of the crime is the place of prosecution, South Carolina could prosecute the accused for only the crimes committed within its borders; and Georgia could prosecute only for the crimes perpetrated within its boundaries. Since the accused's place of duty was in Georgia, South Carolina would have to seek extradition or find him within its borders before a court could try him for his crimes in that State; and if the accused was transferred to a post in another State before he was linked to the crimes, both South Carolina and Georgia would be compelled to resort to extradition.

Constitutional rights are certainly not dependent upon the desirability of practical expedients in criminal prosecution. The problems presented by the case are not mere problems of convenience. They are basic to Federal-State relationships within the framework of the Constitution.

The Federal Government imports large numbers of military persons into State areas. It has the constitutional power to govern these persons. Unless it exercises that power in appropriate ways, it will impose upon the States the enormous economic and administrative burdens incident to regulation of their conduct. I have already indicated that it is not constitutionally impermissible for the Federal Government, through Congress, to provide rules of conduct for members of the armed services that will serve, as far as any penal code can serve, to guard not only the members of the armed services residing on a military reservation against all sorts of rapacious conduct, but also to protect the civilian communities in which military persons circulate when away from the military installation. The problem is generated by the exercise of the Federal power to raise and maintain military forces; and no other constitutional power but the power to govern the military gives Congress the authority to define the crime and provide for prosecution and punishment. In a very real sense, therefore, the rape and robberies committed by this accused were not Federal civilian crimes, but military crimes. No Federal law makes them cognizable in a Federal civilian court. I conclude, therefore, that these offenses were also triable by court-martial, within the meaning of the *O'Callahan* case.

I turn now to consideration of the phrases " 'no military significance' " and "not service connected," as they are discussed in *O'Callahan*. The Supreme Court did not define the meaning of the phrases. However, it implied that circumstances incident to the commission of the crime could establish the military significance or service-connection of the crime. Thus, the

Court enumerated a number of circumstances that could apparently lead to a conclusion that the requisite significance or connection was or was not present. Among these are the following: Whether the accused was away from his base with proper authority; whether he was dressed in civilian clothes; whether there was a connection between his military duty and the crime; whether the crime was committed on a military post; whether the victim of the offense was "performing any duties relating to the military"; whether the crime involved the "flouting" of "military authority"; whether the act compromised the "security of a military post"; whether the act affected "the integrity of military property." *Id.*, at pages 273, 274.

There is evidence in this case tending to indicate the accused was linked to some of the crimes by a Fort Gordon officer's bumper sticker on a car. It is arguable that such identification of the accused with the military is substantially equivalent to connecting him to the military by means of his attire. I need not, however, reach that question. I also need not consider whether any one of the circumstances enumerated by the Supreme Court may alone be sufficient to impart service-connection to the offense. What is important here is that the Supreme Court's enumeration was not, in my opinion, intended to be definitive or exclusive. Other circumstances can establish the military significance of the offense or demonstrate its service-connection.

Until a body of judicial precedent evolves, each case must depend upon its own jurisdictional facts. One factor present in this case is, in my opinion, of unique significance. If the accused had been a civilian, he would not have violated any Federal law and his act would not have been cognizable as a crime in any Federal civilian court. Stated differently, the accused's conduct is a Federal crime only because the Uniform Code of Military Justice defines it as a crime and he, as a military person, is subject to its provisions. In the Uniform Code, Congress has also prescribed the forum for determina-

tion of the accused's guilt or innocence. In sum, the offenses have no Federal existence, and constitutionally can have no Federal existence, except as part of the laws enacted by Congress for the government of the armed forces. Since the offenses have their source in the military powers of the Federal Government, and there are no counterpart Federal offenses that can be committed by civilians in the circumstances of this case, I think the offenses have military significance within the meaning of *O'Callahan.*

In reaching my conclusion as to the military significance of the offenses, I have not overlooked the fact that the legislation for service persons is markedly different from that of the generality of the population. I considered that difference in connection with the power of Congress to govern particular geographical areas, such as the District of Columbia and the special territories. What I said there about the power of Congress to regulate the conduct of persons within these areas in relation to control of the conduct of persons outside the areas is equally applicable here. Congress, in my opinion, has constitutional power to govern service persons differently from the generality of the population. See United States v Noyd, 18 USCMA 483, 40 CMR 195.

Congress can create special tribunals for the trial of causes arising out of, or in connection with, the exercise of its separate powers. The Court of Claims, the Customs Court, and the Courts of the District of Columbia, criminal as well as civil, illustrate applications of this power. Unlike the situation in the *O'Callahan* case, no civilian court created by, or under the authority of, Congress is empowered to punish the accused for the crimes committed by him. In the Uniform Code of Military Justice, Congress has provided a comprehensive system of military tribunals. As I read the *O'Callahan* case, it does not categorically rule out rape and robbery committed off a military reservation as offenses that cannot be tried by court-martial. I conclude, therefore, that the offenses committed by the

accused had military significance subject to court-martial jurisdiction under the Uniform Code and the Constitution.

A number of the offenses for which the accused was convicted were the subject of two proceedings in the State courts of South Carolina. The accused contends that in separate trials in these courts he was acquitted by a jury of these offenses. He now urges the acquittals as a bar to prosecution by the Federal Government.

To this moment, a long line of decisions, including Abbate v United States, supra, stands opposed to the defense contention. The argument has a certain appeal as to those instances in which the Federal offense is based directly and specifically upon a violation of State law. See 18 USC § 43; United States v Heard, 270 F Supp 198 (WD Mo) (1967); cf. United States v Press Publishing Co., 219 US 1, 55 L Ed 65, 31 S Ct 212 (1911). This case, however, does not involve incorporation of a State offense into Federal law, and the Supreme Court has never receded from its determination that the constitutional provision against double jeopardy does not forbid prosecution by both the Federal and State Governments for violation of their respective penal codes. Nothing in the Supreme Court's more recent consideration of the double jeopardy provision suggests a change in this constitutional doctrine.

To a degree, Congress has recognized that dual prosecution for a single act may sometimes be more retributive than just. See 18 USC §§ 659, 660, 1992; cf. 18 USC § 233. As a matter of policy, the Army has cautioned against military prosecution of the same act over which a "civil court has exercised jurisdiction." Army Regulation 22–12, paragraph 2, April 24, 1958. That policy was considered in this case. On the record before us, whether the matter merits further consideration is not a judicial, but an administrative, question. See United States v Gomes, 3 USCMA 232, 235–236, 11 CMR 232; cf. United States v Knudson, 4 USCMA 587, 16 CMR 161. I would affirm the decision of the board of review.

I cannot conclude this opinion without speaking out against the fossil-like canard that military justice is institutionalized injustice. During almost a quarter of our history as a Nation, Congress has shaped and honed the character and processes of military justice as part of the broad ideal and actuality of American justice, not as a separate instrumentality of command to effectuate military purposes.

More than two decades ago, Arthur Vanderbilt, one of America's most respected lawyers, headed a group of eminent jurists and lawyers known generally as the Vanderbilt Committee, whose purpose was to study the military justice system. The Committee had "a free hand" in its inquiry. It held regional hearings at which it took over 2,500 pages of testimony; it studied "voluminous" reports and "digested hundreds of letters." It reported that the Army system of justice as established by Congress was "a good one"; that it was "designed to accord a fair trial" and, in fact, "the innocent are almost never convicted and the guilty seldom acquitted." The Committee also reported abuses by individuals in the administration of the system, but similar abuses are not rare in the civilian community. Report of War Department Advisory Committee on Military Justice, December 13, 1946.

I have served as Chief Judge of this Court since its creation by Congress as the Supreme Court for the military justice system. I have seen instances of arbitrary power that could not be reconciled with our concepts of impartial justice. Some of the abuses in individual cases were corrected; others were not, but all of the instances of abuse were alien to the system, just as instances of injustice resulting from arbitrary and venal judges and lawyers in the civilian community are alien to the principles of justice in civilian law.

Military lawyers are graduates of accredited law schools; many have

graduated in the upper quarter of their class. The military services maintain a system of continuing legal education that surpasses any available to the average civilian lawyer; and the legal periodicals on current developments in civilian and military law published by the military are, in my opinion, comparable in quality to the law reviews of our outstanding law schools.

Consistently, I have maintained that the "courts-martial system can truly be regarded as an integral part of the federal judiciary." Quinn, Some Comparisons Between Courts-Martial and Civilian Practice, 15 UCLA Law Review 1240 (1968). See also Quinn, The United States Court of Military Appeals and Military Due Process, 35 St. John's Law Review 225 (1961). Since I am so intimately associated with the system, my statement may appear to be self-serving. I am confident, however, that it can survive any point by point comparison of the substantive and procedural provisions of the military criminal law as delineated by Congress in the Uniform Code of Military Justice and the actual administration of the law as reflected in the cases with the criminal law and its administration in the civilian community. In my opinion, the American people can take just pride in the system of government of the armed forces provided by Congress and in the administration of that system by their fellow civilians in uniform. I feel privileged to be part of, and to have been able to contribute to, the development of that system.