JOSEPH P. MERCER, former Sergeant, U. S. Army, Petitioner

v

WILBUR S. DILLON, Colonel, Commandant, U. S. Disciplinary
Barracks, Fort Leavenworth, Kansas, Respondent

19 USCMA 264, 41 CMR 264

Miscellaneous Docket
No. 69–57

March 6, 1970

*F. Robert Reeder, Esquire,* and *Captain Thomas R. Maher* argued the cause for Petitioner. With them on the brief was *George W. Latimer, Esquire.*

*Colonel David T. Bryant* argued the cause for Respondent. With him on the brief were *Major Edwin P. Wasinger* and *Captain Larry S. Seuferer.*

## Opinion of the Court

DARDEN, Judge:

This petition presents the issue of whether the decision of the Supreme Court in O'Callahan v Parker, 395 US 258, 23 L Ed 2d 291, 89 S Ct 1683 (1969), is to be applied in cases not subject to direct review on the date of that decision.

After his plea of guilty in 1967, a general court-martial[2] convicted the petitioner of rape and sentenced him to a dishonorable discharge, total forfeitures, confinement at hard labor for life, and reduction in grade. The convening authority reduced the period of confinement to ten years and the board of review affirmed. This Court denied a petition for review in August 1968, and the petitioner is serving his sentence at the United States Disciplinary Barracks, Fort Leavenworth, Kansas. His petition seeks reconsideration of this Court's order denying review or release upon habeas corpus or coram nobis.

This Court is not unanimous in viewing the consideration of extraordinary relief in this instance as being in aid of its jurisdiction, as section 1651 of Title 28, United States Code,

---

[2] CM 417336.

requires, but the majority position on that issue results in our addressing the petition on the merits.

At the time of the offense the petitioner lived on post at Schofield Barracks, Hawaii, with his wife and her two children by a former marriage. When he was unsuccessful in trying to persuade his wife not to go out with another man, he informed her that "something was going to happen that night" and that he would call her to explain "what he had done." Later he drove off base with his eight-year-old stepdaughter, raped her, and returned to his home.

Although the Government contends that the offense in this case was service-connected within the meaning of O'Callahan v Parker, supra, we do not decide that question in view of our disposition of the case on other grounds.

For the reasons stated below we propose to apply the decision in O'Callahan v Parker, supra, only to those convictions that were not final before June 2, 1969, the date of the O'Callahan decision.

This Court has already given a limited retrospective effect to the O'Callahan decision by applying it to those cases still subject to direct review on the date of that decision. United States v Borys, 18 USCMA 547, 40 CMR 259 (1969); United States v Prather, 18 USCMA 560, 40 CMR 272 (1969).

Anything less than full retroactivity is subject to incongruities such as the one mentioned by Mr. Justice Douglas dissenting in Desist v United States, 394 US 244, 255, 22 L Ed 2d 248, 89 S Ct 1030 (1969):

". . . The most notorious example is Miranda v Arizona, 384 US 436, 16 L Ed 2d 694, 86 S Ct 1602, 10 ALR3d 974, where, as I recall, some 80 cases were presented raising the same question. We took four of them and held the rest and then disposed of each of the four, applying the new procedural rule retroactively. But as respects the rest of the pending cases we denied any relief. Johnson v New Jersey, 384 US 719, 16 L Ed 2d 882, 86 S Ct 1772. Yet it was sheer coincidence that those precise four were chosen. Any other single case in the group or any other four would have been sufficient for our purposes."

Chief Justice Warren had what is to us a sensible answer when he recognized in Jenkins v Delaware, 395 US 213, 23 L Ed 2d 253, 89 S Ct 1677 (1969), that such incongruities must be balanced against the objective of the changed constitutional interpretation that could not otherwise be practically effected.

The decision in O'Callahan speaks in terms of jurisdiction. Traditionally, lack of subject-matter jurisdiction voids a conviction. Ex parte Siebold, 100 US 371, 25 L Ed 717 (1880). Because the new standard in O'Callahan was expressed in terms of jurisdiction, does this necessarily change the pronouncements in Linkletter v Walker, 381 US 618, 14 L Ed 2d 601, 85 S Ct 1731 (1965), that the Constitution neither prohibits nor requires retrospective effect?

The effect of the O'Callahan decision may be viewed as extending to members of the armed forces in some circumstances constitutional rights of grand jury indictment and trial by petit jury. Such a view conduces to only a prospective application of the extension. Gosa v Mayden, 305 F Supp 486 (ND Fla) (1969). Other possible justifications for prospective effect are the thoughts that O'Callahan did not rule on the existence of subject-matter jurisdiction, that it limited the *exercise* of such jurisdiction, and that this limitation is functional only. United States v King, ACM 20361, July 30, 1969.

In a flow of decisions over the last decade that has been termed a criminal law revolution, the Supreme Court has redefined and extended the rights of persons subjected to both

Federal and State trials. Although these decisions have often dealt with the applicability of various provisions of the Bill of Rights to the States through the due process clause of the Fourteenth Amendment, they have not related exclusively to State procedures. Cf. United States v Wade, 388 US 218, 18 L Ed 2d 1149, 87 S Ct 1926 (1967).

In Linkletter v Walker, supra, the Supreme Court reviewed the arguments on whether a judicial decision that overturns previously established law is to be applied retroactively. The Court concluded that "the Constitution neither prohibits nor requires retrospective effect." Linkletter v Walker, supra, at page 629.

Each case must be determined by a careful weighing of the complex interests enumerated in Stovall v Denno, 388 US 293, 18 L Ed 2d 1199, 87 S Ct 1967 (1967), as:

(a) The purpose to be served by the new standard;

(b) The extent of the reliance by law enforcement authorities on the old standards; and

(c) The effect on the administration of justice of a retroactive application of the new standard.

The purpose to be served has been called the foremost of these factors and the other two have been relied on only when the purpose did not clearly dictate either a retroactive or a prospective application. Desist v United States, supra.

We consider first the purpose of the O'Callahan decision. Our present task is not to reargue the merits of that decision by emphasizing the extensive statutory and judicial protections an accused in the armed forces enjoys.[3] We think it relevant to point out, however, that one of the deficiencies in military justice mentioned in the O'Callahan decision is that the presiding judge does not enjoy constitu-

tional protection of tenure and salary; this is also true of State courts, in which most of the serious nonservice-connected crimes such as murder and rape are now being tried. While the military lacks a true grand jury system, Article 32 of the Uniform Code of Military Justice, 10 USC § 832, provides a substitute pretrial investigation that in some ways may be considered superior to the grand jury in that an accused has the right to be present, to present exonerating evidence, to cross-examine adverse witnesses, and to be represented by counsel, none of which rights he enjoys as constitutional rights in civilian proceedings. In fact, under existing constitutional decisions, the Federal right to indictment or to presentment by grand jury does not apply to the States. Hurtado v People of California, 110 US 516, 28 L Ed 232, 4 S Ct 111 (1884); see Beck v Washington, 369 US 541, 8 L Ed 2d 98, 82 S Ct 955 (1962).

Other aspects of a military trial that have been cited unfavorably in comparison with civilian trials are the absence of a requirement for a unanimous verdict and the possibility that members of the court may not enjoy the same independence of judgment as civilian members of a jury. Against these charged deficiencies should be balanced the possibility that the composition of a court-martial is for a member of the armed forces more nearly a jury of his peers than is a civilian panel in a State where the member may be involuntarily stationed.

Irrespective of whether the purpose of the new decision indicates the result on retroactivity, we believe that the second and third factors in the Stovall standard strongly suggest a denial of retroactive application.

Regarding the second Stovall test, the armed forces have acted in good faith in assuming that the Constitution empowered Congress to provide for trial by courts-martial of offenses now held to be nonservice-connected. The result in O'Callahan had not been

---

[3] Quinn, Some Comparisons Between Courts-Martial and Civilian Practice, 15 UCLA Law Review 1240 (1968).

foreshadowed in other opinions. Before *O'Callahan* the armed forces had absolutely no hint that such considerations as the nature, time, and place of the offense might limit trials by courts-martial. In Wolf v Colorado, 338 US 25, 93 L Ed 1782, 69 S Ct 1359 (1949), the Supreme Court had given notice of its concern that States not permit use of illegally procured evidence and in the absence of State-initiated safeguards the Court later implemented its concern in Mapp v Ohio, 367 US 643, 6 L Ed 2d 1081, 81 S Ct 1684 (1961). In contrast, all the guidance the military had tended to indicate that the sole determinant of jurisdiction was status. For instance, in Kinsella v United States, 361 US 234, 246, 4 L Ed 2d 268, 80 S Ct 297 (1960), the Supreme Court declared:

". . . [T]he power [of Congress] to 'make Rules for the Government and Regulation of the land and naval Forces' bears no limitation as to offenses. The power there granted includes not only the creation of offenses but the fixing of the punishment therefor. If civilian dependents are included in the term 'land and naval Forces' at all, they are subject to the full power granted the Congress therein to create capital as well as noncapital offenses. *This Court cannot diminish and expand that power,* either on a case-by-case basis or on a balancing of the power there granted Congress against the safeguards of Article 3 and the Fifth and Sixth Amendments. Due proccess cannot create or enlarge power." [Emphasis supplied.]

In that same opinion the Court also indicated "[t]he test for jurisdiction, it follows, is one of *status,* namely, whether the accused in the court-martial proceeding is a person who can be regarded as falling within the term 'land and naval Forces.'" *Id.,* at page 241.

In the absence of any indication of a constitutional infirmity in courts-

martial, neither the Congress nor the armed forces had any reason to restrict the jurisdiction of such courts.

The transcendent reason for our position is the effect of a retroactive application of *O'Callahan* on the administration of justice, the final test as outlined in Stovall v Denno, supra. About the right to trial by jury in the States, the Supreme Court noted in DeStefano v Woods, 392 US 631, 634, 20 L Ed 2d 1308, 88 S Ct 2093 (1968):

". . . [T]he effect of a holding of general retroactivity on law enforcement and the administration of justice would be significant, because the denial of jury trial has occurred in a very great number of cases. . . ."

In many of the courts-martial of earlier years, jurisdictional facts could have been developed on the record if there had been any reason to predict the need for doing so. The practical effect of voiding earlier convictions will often be to grant immunity from prosecution as a result of State statutes of limitations having run, witnesses having been scattered, and memories having been taxed beyond permissible limits.

Peacetime court-martial jurisdiction over what became nonservice-connected offenses under *O'Callahan* was first expressly conferred in 1916.[4] This jurisdiction was extended in 1950 to include murder and rape committed in the United States in peacetime.[5] Thus the possibility of retroactive reconsideration exists as far back as 1916.

We recognize that not all the persons possibly entitled to review and relief would have the initiative or a sufficient financial interest to justify the time and expense of bringing suits or applications. A reliable estimate of the number of court-martial convictions that could be overturned by

---

[4] Act of August 29, 1916, chapter 418, section 1342, 39 Stat 650.

[5] Act of May 5, 1950, chapter 169, 64 Stat 107.

a retroactive application of *O'Callahan* is nearly impossible to secure. For the one fiscal year of 1968, the Army, the Navy, and the Air Force conducted. approximately 74,000 special and general courts-martial. If only the smallest fraction of these courts-martial and those conducted in the other years since 1916 involved an *O'Callahan* issue, it is an understatement that thousands of courts-martial would still be subject to review. The range of relief could be extensive, involving such actions as determinations by the military departments of whether the character of discharges must be changed, and consideration of retroactive entitlement to pay, retired pay, pensions, compensation, and other veterans' benefits. Among the difficulties would be the necessity of reconstructing the pay grade that a member of the armed forces would have attained except for the sentence of the invalidated court-martial, a task complicated by the existence of a personnel system involving selection of only the best qualified eligibles and providing for the elimination of others after specified years of service.

A per curiam opinion in DeStefano v Woods, supra, refers to the Court's statement in Duncan v Louisiana, 391 US 145, 158, 20 L Ed 2d 491, 88 S Ct 1444 (1968), that "We would not assert, however, that every criminal trial—or any particular trial—held before a judge alone is unfair or that a defendant may never be as fairly treated by a judge as he would be by a jury." The *DeStefano* opinion continues:

"... The values implemented by the right to jury trial would not measurably be served by requiring retrial of all persons convicted in the past by procedures not consistent with the Sixth Amendment right to jury trial. ... States undoubtedly relied in good faith upon the past opinions of this Court to the effect that the Sixth Amendment right to jury trial was not applicable to the States. ... [T]he effect of a holding of general retroactivity on law enforcement and the administration of justice would be significant, because the denial of jury trial has occurred in a very great number of cases in those States not until now accepting the Sixth Amendment guarantee." [392 US, at page 634.]

It seems that all these comments apply with at least equal force to an analysis of the effect of applying *O'Callahan* retroactively. Though we deal here with the fairness of a trial by members of a court-martial as compared to a jury, while in *Duncan* the comparison was between judge and jury, we still could not assert that every criminal trial or any particular trial by court-martial is unfair or that an accused may never be as fairly treated by members of a military court as he would be by a civilian jury. As in many of the cases affected, the accused in the case *sub judice* pleaded guilty. How could it be argued that he has been subjected to an unfair trial on the issue of his guilt? Second, the armed forces undoubtedly relied on the absence of any earlier indication that anything other than status limited the authority of Congress to make crimes punishable by court-martial. Finally, when a holding of general retroactivity would place countless convictions for serious crimes in jeopardy and would often result not in a retrial by a civilian court but an avoidance of further trial, we have no difficulty in concluding that the disruption of the administration of justice would be substantial.

The petition is denied.

Chief Judge QUINN concurs.

FERGUSON, Judge (dissenting):

I dissent.

The issue before the Supreme Court of the United States in O'Callahan v Parker, 395 US 258, 23 L Ed 2d 291, 89 S Ct 1683 (1969), was whether courts-martial had jurisdiction to try persons belonging to the armed services for criminal acts because of their status alone. Having reversed O'Callahan's conviction on the ground

that status alone did not invest jurisdiction in a court-martial, did the Supreme Court intend that its ruling would only be applied after the date of its opinion, June 2, 1969, or some other date? O'Callahan was convicted by a court-martial in 1956. His conviction was affirmed by this Court on March 1, 1957 (7 USCMA 800). See also United States v O'Callahan, 16 USCMA 568, 37 CMR 188 (1967). The Supreme Court in *O'Callahan* did not directly speak of the question of retroactivity. We held cases in this Court pending the *O'Callahan* decision. Our subsequent decisions in those cases granted a measure of retroactive application. The Supreme Court on February 27, 1970, agreed to hear arguments on whether its *O'Callahan* holding should be applied retroactively or prospectively only. My brothers have decided to publish their opinion on this question rather than await the action of the Supreme Court. I am therefore compelled to set forth my views. However, in my opinion, this Court should not act until we have a Supreme Court holding. It makes no difference what we decide relative to this constitutional jurisdictional question. It is what the Supreme Court of the United States decides that will control the future cases of this Court, unless we expect to not follow their ruling and therefore create chaos and deny those same constitutional protections to those who have served their country in war and peace to protect the Constitution from its enemies. This cannot be allowed to happen. To not decide this case now is not to shirk our responsibility; it is to follow a proper course and have stability in the law.

In the four short years since the Supreme Court embraced the idea that constitutional decisions in criminal cases need not be retroactively applied,[1] the Supreme Court has created an extraordinary collection of rules governing the application of the principle of retroactivity:

1. To be applied to all cases then subject to direct review;[2]

2. To be applied to all those cases in which trials have not yet commenced;[3]

3. To be applied to all cases in which the tainted evidence has not yet been introduced;[4]

4. To be applied only to the petitioner involved in the case in which the new rule is announced and all future cases in which the proscribed official conduct has not yet occurred.[5]

None of these decisions are on the question involved in O'Callahan v Parker, supra, *i.e.,* the jurisdiction of a court over the subject matter involved.

In general, I am opposed to the doctrine enunciated and applied by the Supreme Court in recent years that decisions regarding the application of constitutional protections may be applied prospectively, thereby denying to those convicted in the past the shield of an instrument that has been in existence for almost two hundred years as a limitation on the awesome power of our Government when arrayed against one of its citizens. First, and most importantly, I believe that an appellate court should not apply *constitutional protections* only to cases decided or tried after a certain date and not to those tried before such date; to do so is to deny equal justice under the law to the defendants involved. As Mr. Justice Douglas pointed out in Desist v United States, 394 US 244, 22 L Ed 2d 248, 89 S Ct 1030 (1969), speaking of Johnson v New Jersey, 384 US 719, 16 L Ed 2d

---

[1] Linkletter v Walker, 381 US 618, 14 L Ed 2d 601, 85 S Ct 1731 (1965).

[2] Tehan v Shott, 382 US 406, 15 L Ed 2d 453, 86 S Ct 459 (1966).

[3] Johnson v New Jersey, 384 US 719, 16 L Ed 2d 882, 86 S Ct 1772 (1966).

[4] Fuller v Alaska, 393 US 80, 21 L Ed 2d 212, 89 S Ct 61 (1968).

[5] DeStefano v Woods, 392 US 631, 20 L Ed 2d 1308, 88 S Ct 2093 (1968).

882, 86 S Ct 1772 (1966), it was by the merest happenstance that the Supreme Court chose to apply a new interpretation of the Fifth and Sixth Amendments—enunciated in Miranda v Arizona, 384 US 436, 16 L Ed 2d 694, 86 S Ct 1602 (1966)—to certain criminal cases then pending and not to others, even though some were actually tried after Miranda was tried. The result is that some men went free or won new trials while others continued to languish in prison—and this, despite the fact that each and every such trial was infected with the same error of identical constitutional proportions. For a court much given to pronouncements about reasonable classifications and high standards of criminal justice to deem such either "equal," "justice," or "under the law" is, in my view, a violation of due process and *unequal* protection under the law.

Moreover, the assumption of such a power by judicial officers clothes the court with the mantle of the legislature, giving to it the powers delegated, by the very Constitution which it purports to apply, to a different and coordinate branch of the Government. It should not act as the legislature. Federal judges are appointed, not elected by the people, for the very reason that our Founding Fathers deemed it wise to insulate the judiciary from the clamor of the public in deciding particular cases.

It is obvious that, under the standards laid down in Linkletter v Walker, 381 US 618, 14 L Ed 2d 601, 85 S Ct 1731 (1965), and Stovall v Denno, 388 US 293, 18 L Ed 2d 1199, 87 S Ct 1967 (1967), the Supreme Court has, as stated by Mr. Justice Black in his dissent in *Stovall,* at page 304:

". . . legislate[d] a timetable by which the Constitution's provisions shall become effective. For reasons stated in my dissent in Linkletter v Walker, 381 US 618, 640, 14 L Ed 2d 601, 85 S Ct 1731, 1743, I would hold that the petitioner here and every other person in jail under convictions based on

unconstitutional evidence should be given the advantage of today's newly announced constitutional rules."

Even the majority in *Linkletter* acknowledged that it was, therein, establishing a new rule:

". . . It is true that heretofore, without discussion, we have applied new constitutional rules to cases finalized before the promulgation of the rule. [Footnote citations omitted.] Petitioner contends that our method of resolving those prior cases demonstrates that an absolute rule of retroaction prevails in the area of constitutional adjudication. However, we believe that the Constitution neither prohibits nor requires retrospective effect. As Justice Cardozo said, '*We think the federal constitution has no voice upon the subject.*' [Great Northern R. Co. v Sunburst Oil & Ref. Co., 287 US 358, 364, 77 L Ed 360, 53 S Ct 145 (1932) (referring to State court's prospective overruling of prior decision).]

"Once the premise is accepted that we are neither required to apply, nor prohibited from applying, a decision retrospectively, we must then weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." [*Ibid.,* 381 US 628, 629.] [Emphasis supplied.]

I believe that the Supreme Court's reliance on the out-of-context statement by Justice Cardozo in *Great Northern,* as quoted above, is seriously misplaced. It was alleged in *Great Northern,* a suit to recover overcharges on an intrastate shipment of freight, that the refusal of the Supreme Court of Montana to apply its decision retroactively was a denial of due process under the Fourteenth Amendment to the United States Constitution. The Supreme Court of the United States rejected this allegation and said, at 287 US, page 364:

"We have no occasion to consider whether this division in time of the effects of a decision is a sound or unsound application of the doctrine of stare decisis as known to the common law. Sound or unsound, *there is involved in it no denial of a right protected by the Federal constitution.*" [Emphasis supplied.]

Since the decision in *Great Northern* did not rise to the level of a constitutional rule, it is hardly precedent for the basic premise in *Linkletter* that the Supreme Court is "neither required to apply, nor prohibited from applying, a decision retrospectively." Absent the statement in *Great Northern*, the Supreme Court's refusal, for the first time, to give a previously convicted defendant the benefit of a new and more expansive Bill of Rights interpretation is, in my view, inexplicable. Cf. Fay v Noia, 372 US 391, 9 L Ed 2d 837, 83 S Ct 822 (1963), and Reck v Pate, 367 US 433, 6 L Ed 2d 948, 81 S Ct 1541 (1961), wherein, on petition of habeas corpus, convictions obtained twenty-one and twenty-five years before, were reversed because each accused had been convicted through the use of coerced confessions. See also Justice Harlan's discussion of "Retroactivity on Habeas Corpus," in his separate opinion in Desist v United States, supra.

But even were I to accept the Court's basic premise in *Linkletter*, I believe that this case involves more than just a new and more expansive interpretation of the Bill of Rights. Rather, it goes to the very heart of the court-martial process—jurisdiction over the particular offense. Where jurisdiction is lacking, there can be no question of prospective or retrospective application, for when a court-martial proceeds without jurisdiction, its action is null and void. McClaughry v Deming, 186 US 49, 46 L Ed 1049, 22 S Ct 786 (1902). See

also Ex parte Siebold, 100 US 371, 25 L Ed 717 (1880).

The accused, in this case, petitioned for relief on the ground that the court-martial was without jurisdiction to try him for the alleged offense under the principles enunciated by the Supreme Court in O'Callahan v Parker, supra, and by this Court in United States v Borys, 18 USCMA 547, 40 CMR 259 (1969). The question before the Supreme Court in *O'Callahan* was:

" 'Does a court-martial, held under the Articles of War, Tit. 10, USC § 801 *et seq.*, have jurisdiction to try a member of the Armed Forces who is charged with commission of a crime cognizable in a civilian court and having no military significance, alleged to have been committed off-post and while on leave, thus depriving him of his constitutional rights to indictment by a grand jury and trial by a petit jury in a civilian court?' "

After analyzing the growth of the court-martial procedure in the United States and its own decision that "court-martial jurisdiction cannot be extended to reach any person not a member of the Armed Forces at the times of both the offense and the trial,"[6] the Court stated:

"We have concluded that the crime to be under military jurisdiction must be service connected, lest 'cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger,' as used in the Fifth Amendment, be expanded to deprive every member of the armed services of the benefits of an indictment by a grand jury and a trial by a jury of his peers." [395 US, at page 272.]

Since O'Callahan's offenses were found not to be "service-connected,"

---

[6] "Toth v Quarles, 350 US 11, 100 L Ed 8, 76 S Ct 1 (1955). . . . McElroy v Guagliardo, 361 US 281, 4 L Ed 2d 282, 80 S Ct 305 (1960); Grisham v Hagan, 361 US 278, 4 L Ed 2d 279, 80 S Ct 310 (1960); . . . Kinsella v Singleton, 361 US 234, 4 L Ed 2d 268, 80 S Ct 297 (1960); Reid v Covert, 354 US 1, 1 L Ed 2d 1148, 77 S Ct 1222 (1957)." [395 US, at page 267.]

the Supreme Court held that the court-martial was *without jurisdiction to proceed.* See also United States v Borys, supra.

My brothers, in this case, take the position that, "The effect of the *O'Callahan* decision may be viewed as extending to members of the armed forces in some circumstances constitutional rights of grand jury indictment and trial by petit jury." From this they proceed to demonstrate that the Federal right to indictment or presentment by grand jury does not apply to the States (Hurtado v People of California, 110 US 516, 28 L Ed 232, 4 S Ct 111 (1884); Beck v Washington, 369 US 541, 8 L Ed 2d 98, 82 S Ct 955 (1962)), and that in DeStefano v Woods, 392 US 631, 20 L Ed 2d 1308, 88 S Ct 2093 (1968), the Supreme Court held, in accord with its *Linkletter* and *Stovall* opinions, that it would "not reverse state convictions for failure to grant jury trials where trials began prior to May 20, 1968, the date of this Court's decisions in Duncan v Louisiana [391 US 145, 20 L Ed 2d 491, 88 S Ct 1444 (1968)] and Bloom v Illinois [391 US 194, 20 L Ed 2d 522, 88 S Ct 1477 (1968)]." (*Ibid.,* 392 US, at page 635.)

Rather than being helpful to the majority's opinion in this case, I believe that *DeStefano,* and its companion case of Carcerano v Gladden (same citation), serve to disprove their case. DeStefano was convicted of criminal contempt, without a jury, in an Illinois Court and sentenced to serve three concurrent one-year sentences. Carcerano was convicted of armed robbery and sentenced to life imprisonment by a less than unanimous verdict.[7] Since both were tried prior to May 20, 1968, their convictions were affirmed by the Supreme Court. O'Callahan, on the other hand, was tried by court-martial (no jury) in 1956. His conviction was reversed by the Supreme Court on June 2, 1969, more than one year after the decision in *DeStefano* and *Carcerano.* Had the

Supreme Court's decision in *O'Callahan* rested exclusively on the denial of his right to indictment and trial by jury, it would have affirmed, because his trial began some twelve years prior to May 20, 1968. Since it did not, it is obvious that the decision in *O'Callahan* rested exclusively on the lack of court-martial jurisdiction to try non-service-connected offenses. Even the dissent in *O'Callahan* speaks exclusively of the *jurisdictional* question involved and makes no reference to the failure to accord servicemen, accused of nonservice-connected offenses, trial by a jury.

Simply stated, I believe that *O'Callahan* holds that the Congress, in granting court-martial jurisdiction over offenses that are not service-connected and which are committed in areas where the civil courts of the United States are open and functioning, exceeded the power given to it "To make Rules for the Government and Regulation of the land and naval Forces," as contained in Article I, section 8, clause 14, of the Constitution. Since the Congress was without power to grant jurisdiction in these circumstances, trial by court-martial was null and void. O'Callahan v Parker; United States v Borys; McClaughry v Deming, all supra.

Military jurisdiction is purely statutory. It depends for its existence upon an enactment of the Congress. O'Callahan v Parker, supra, is a construction of the current enactment in the Uniform Code of Military Justice and is designed so to view the Act as to make it conform with the Constitution of the United States by interpreting it to apply only to service connected crimes. It is the duty of an appellate court so to construe an enactment of the Legislature if such may be done. United States v Jacoby 11 USCMA 428, 29 CMR 244 (1960): Crowell v Benson, 285 US 22, 76 L Ed 598, 52 S Ct 285 (1932).

---

[7] The Oregon Constitution, Article I, section 11, permits a jury to convict in noncapital cases if ten of twelve jurors support conviction.

As such, how is it possible for this Court rationally to state that the Code should be so construed as to the future but not as to its past? When we deal with an Act of Congress, it must be applied and construed in the same manner from the date of its enactment. Surely, it should not be said that it is to be construed in one manner to a certain date but, following that date, it is to be accorded a different and more limited application. Yet, that is the precise result which obtains here and for the reason, I believe, that my brothers do not fully and correctly interpret the *O'Callahan* decision.

Thus, the cases which they cite refer to applications of new rules of procedure and evidence which obtain as the result of a different interpretation of constitutional limitations. The Supreme Court freely admits that, in such instances, it is applying these rules prospectively, but in not one such case was interpretation of an Act of Congress in order to accord with the Constitution involved. Cf. United States v Jacoby, supra. For this reason, even if I were to believe that the matter was not jurisdictional and to accept the doctrine of prospective application wholeheartedly, I cannot agree that *O'Callahan*, supra, enunciates a proposition which should be so applied.

Moreover, I differ with my brothers on their contention that this is an instance in which a wholly new concept of jurisdiction has been introduced. As *O'Callahan* itself indicates, the practice which its rationale requires is one which obtained in Great Britain prior to the Revolution and in this country until 1916. Indeed, the idea of a broad military jurisdiction was not conceived until the Uniform Code was enacted. Moreover, as the Supreme Court itself has heretofore pointed out, military jurisdiction should be narrowly delimited. As long ago as Toth v Quarles, 350 US 11, 100 L Ed 8, 76 S Ct 1 (1955), the Court remarked, at page 22:

". . . Free countries of the world have tried to restrict military tribunals to the narrowest jurisdiction deemed absolutely essential to maintaining discipline among troops in active service. . . .

"Determining the scope of the constitutional power of Congress to authorize trial by court-martial presents another instance calling for limitation to *'the least possible power adequate to the end proposed.'* "

And, in Lee v Madigan, 358 US 228, 3 L Ed 2d 260, 79 S Ct 276 (1959), the Supreme Court granted certiorari on the same constitutional issue as was eventually decided in *O'Callahan*, supra. While it resolved the issue by determining that Lee was tried in time of peace for murder when the Articles of War authorized trial of such a charge only in time of war, the coming of *O'Callahan* was clearly prophesied, if one had the ears to hear and the eyes to read. Indeed, at least one young officer foresaw precisely the situation with which we are now faced, and authored a scholarly law review article in which he predicted the return of military jurisdiction over offenses to its former limits. See Duke and Vogel, The Constitution and the Standing Army: Another Problem of Court-Martial Jurisdiction, 13 Vanderbilt Law Review 435 (1960).

Finally, I believe any comparison between the benefits and detriments of the military and civilian systems to which an accused may or may not be subjected as a result of our application of the *O'Callahan* construction of the Code is irrelevant to our decision here. *We are concerned not with an individual's particular rights in a trial, but with the power of the court-martial to judge him. O'Callahan, supra, teaches clearly that such power is lacking and that the purported application of the Uniform Code to the contrary is erroneous.* Accordingly, it is clear that we should grant relief to any accused who was convicted of an "offense" over which the armed services had no jurisdiction.

As the principal opinion reaches a contrary result, I record my disagreement therewith. I would grant the petition, set aside the findings and sentence, and order the charge dismissed.