UNITED STATES

v.

**Airman Basic Roger D. LOCKWOOD, II, FR 440–74–7524, United States Air Force.**

**ACM S25149.**

U. S. Air Force Court of Military Review.

Sentence Adjudged 23 Dec. 1980.

Decided 30 July 1981.

---

Appellate Counsel for the Accused: Colonel George R. Stevens, Captain Willard K. Lockwood and Captain Neil S. Richman, USAFR.

Appellate Counsel for the United States: Colonel James P. Porter and Captain Michael J. Hoover.

Before ARROWOOD, MAHONEY and MILLER, Appellate Military Judges.

## DECISION

ARROWOOD, Senior Judge:

Tried before a special court-martial, the accused was convicted pursuant to his pleas of failing to obey an order, stealing a wallet, fraudulently obtaining money from an off-base loan company, and forging the signature of another serviceman to the promissory note used in obtaining the fraudulent loan money, in violation of Articles 92, 121 and 123, Uniform Code of Military Justice, 10 U.S.C. §§ 892, 921 and 923.

We address but a single issue. Under the facts here, did the court-martial possess jurisdiction over the offenses of larceny and forgery committed at the off-base loan company? A wallet belonging to Airman Charles M. Sage was found on base by the accused's roommate who placed it in his dormitory room for safe keeping. During the roommate's absence, the accused stole the wallet and took it to a local loan compa-

ny. He used the identification cards from the wallet, including Sage's military identification card, to fraudulently obtain a loan in Sage's name. He forged Sage's name and used his military address on the promissory note involved in the theft.

The recent decision of *United States v. Trottier*, 9 M.J. 337 (C.M.A. 1980), emphasized the non-exclusive nature of the seriatim listing of the twelve factors enumerated in *Relford v. Commandant*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971), in determining service connection, pointed out that *Relford* itself enumerated nine additional considerations and at page 343 quoted the following language from *Schlesinger v. Councilman*, 420 U.S. 738, 760, 95 S.Ct. 1300, 1314, 43 L.Ed.2d 591 (1975):

[The issue of service connection] turns in major part on gauging the impact of an offense on military discipline and effectiveness, on determining whether the military interest in deterring the offense is distinct from and greater than that of civilian society and on whether the distinct military interest can be vindicated adequately in civilian courts. These are matters of judgment that often will turn on the precise set of facts in which the offense occurred. *See Relford v. Commandant*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971). More importantly, they are matters as to which the expertise of military courts is singularly relevant, and their judgments indispensable to inform any eventual review in Article III courts.

Subjecting the facts at bar to an analysis under these guidelines, we find the following specific factors to be significant in resting jurisdiction in the military:

(1) The accused was a member of the military and properly absent from the base.

(2) The accused represented himself to be Airman Sage by using Sage's military identification card and military on-base address to perpetrate the offenses.

(3) The identification card represented more than mere identification to the loan company. It represented military em-

ployment, and income—which could facilitate enforcement of payment of the loan.

(4) The accused used a false military status to victimize a business in the community adjacent to the base, thereby impacting on Air Force-community relations.

(5) The wallet containing military identification cards was taken from a dormitory room on base, a place where accused would not have had access without being a military member.

(6) The wallet was taken from the base in what appears to be an overall scheme to commit the off-base offenses.

We distinguish the facts in this case from those in *United States v. Hopkins*, 4 M.J. 260 (C.M.A. 1978), *United States v. Vick*, 4 M.J. 235 (C.M.A. 1978), *United States v. Sims*, 2 M.J. 109 (C.M.A. 1977), and *United States v. Uhlman*, 1 M.J. 419 (C.M.A. 1976), primarily because the military status of the accused permitted his access to the identification cards, *United States v. Whatley*, 5 M.J. 39 (C.M.A. 1978), and the false military status claimed by the accused represented more than mere identification to the lender.

Having enunciated the factors which are singularly relevant to jurisdiction in this case, we find that the court below properly exercised its jurisdiction over the off-base offenses.

The findings and sentence are correct in law and fact and no error materially prejudicial to the substantial rights of the accused was committed. Accordingly, the findings of guilty and the sentence are

AFFIRMED.

MAHONEY, Judge (concurring):

I accept the rationale of the lead opinion as resolving this case within the framework

of existing precedent on the exercise of court-martial jurisdiction.[1] I also believe two other distinct reasons exist supporting the exercise of jurisdiction by court-martial. *First*, the accused failed to contest at trial the appropriateness of the exercise of military jurisdiction over the forgery and larceny offenses. *Second*, under the facts of this case, the accused would not have benefitted by the constitutional protections underlying the Supreme Court's decision in *O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969).

I. *Failure to Contest Exercise of Court-Martial Jurisdiction.*

At arraignment, the military judge raised the issue of the exercise of jurisdiction by the military court, and provided the defense the opportunity to contest the appropriateness of the court-martial forum. In regard to the larceny and forgery offenses under attack on this review, the following colloquy occurred:

MJ: With regard to the Specification of Charge II, it is alleged at least as occurring off base in Wichita Falls and represents a larceny by fraud which he is alleged to have attempted—or pretended to be Charles Sage in order to get some money from the Murphy Acceptance Corporation and the jurisdictional basis alleged is that he used a—used Sage's military ID card. Do you have any issue as to the jurisdiction on that offense?

DC: No, your honor.

MJ: It appears to the court that all the allegation is that it occurred off-base with a civilian firm that the jurisdictional basis cited is sufficient to establish service connection over the specification and the charge.

\*     \*     \*     \*     \*     \*

---

1. The analysis in the lead opinion is reminiscent of Judge Darden's comparison of *United States v. Peak*, 19 U.S.C.M.A. 19, 41 C.M.R. 19 (1969), with *United States v. Williams*, 18 U.S. C.M.A. 605, 40 C.M.R. 317 (1969), in *United States v. Morisseau*, 19 U.S.C.M.A. 17, 41 C.M.R. 17 (1969). However, I do not believe such analysis is necessary to resolve this case. See my concurring opinion in *United States v. Coronado*, 11 M.J. 522, 525–26, note 3 and accompanying text (A.F.C.M.R. 1981). While I am bound to apply the law announced by the Supreme Court, I echo the belief of former Chief Judge Quinn of the Court of Military Appeals, dissenting in *United States v. Borys*, 18 U.S.C.M.A. 547, 40 C.M.R. 259, 262 (1969): "The accumulated wisdom and literature of legislative and legal opinion are, I believe, opposed to the reasoning in *O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969)."

And the final charge and specification is the Forgery Charge and basically the service connection again is that it is alleged that he used another person's military identification card. It would appear to the court that the jurisdictional basis is sufficient to establish jurisdiction over the specification of the charge. Do you have any issue on jurisdiction on that?

DC: No, your honor.

In short, the defense counsel declined to challenge factually, or as a matter of law, the appropriateness of the exercise of court-martial jurisdiction for those offenses. Based upon the jurisdictional allegations,[2] the military judge found the exercise of court-martial jurisdiction was appropriate.

The parties before a court may not, of course, confer jurisdiction by consent, but they may agree to and be bound by facts necessary to confer jurisdiction. *United States v. Garcia*, 5 U.S.C.M.A. 88, 17 C.M.R. 88 (1954). Under *O'Callahan*, the question to be determined is not whether the court has jurisdiction over an offense cognizable by the Uniform Code of Military Justice, but rather whether it should exercise that jurisdiction. *See, Mercer v. Dillon* 19 U.S. C.M.A. 264, 41 C.M.R. 264, 265 (1970). Unquestionably, it may exercise that jurisdiction if the offense is not subject to prosecution in a civil court in the United States.[3] When the offense is subject to such prosecution, the court-martial, may nevertheless, exercise its jurisdiction where the offense is "service-connected," as that term has been defined in *O'Callahan* and its progeny. *See, United States v. Trottier*, 9 M.J. 337, 340–343 (C.M.A. 1980). Here, the defense acquiesced in the factual allegations and conclusions which clearly support "service-connection" and the exercise of jurisdiction. *See*, note 2, *supra*. Thus, I conclude that the trial court properly exercised jurisdiction over the larceny and forgery offenses,

**2.** The jurisdictional allegations accompanied the charges as required by *United States v. Alef*, 3 M.J. 414 (C.M.A. 1977). The jurisdictional allegations for the forgery offense read as follows:

JURISDICTIONAL BASIS: The jurisdictional basis for the prosecution of this offense is that the accused was an active duty military member; that the accused signed another military member's name on the forged document and the civilian business which accepted the forged document relied on a military identification card in accepting the document; that the accused used a military identification card of another to commit the offense; that the accused obtained the means of committing this offense (military identification card) by larceny of the card at Sheppard Air Force Base; that if genuine, the forged document would obligate another military member to a financial responsibility; that the offense occurred in an off-base business that is in close proximity to Sheppard Air Force Base and the offense could affect the community relationship with that business; and the conduct of the accused constituted a threat to the good order, discipline, and military effectiveness of the base. Although this offense could be subject to prosecution by civilian courts, the over all circumstances give the military community an overriding interest in prosecuting this offense.

The jurisdictional allegations for the larceny by false pretense offense read as follows:

JURISDICTIONAL BASIS: The jurisdictional basis for the prosecution of this offense is that the accused was present for duty on Sheppard Air Force Base when the offense occurred; that the accused used a military identification card of another to commit the offense; that the accused obtained the means of committing this offense (military identification card) by larceny of the card at Sheppard Air Force Base; that intent to commit this offense apparently formulated on Sheppard Air Force Base; that the victim, Murphy Acceptance Corporation is a business in close proximity to Sheppard Air Force Base and the offense could affect the community relationship with that business; and that the conduct of the accused constituted a threat to the good order, discipline, and military effectiveness of the base. Although this offense could be prosecuted by the civilian courts, the overall circumstances give the military community an overriding interest in prosecuting this offense.

**3.** *Contra, United States v. Carr*, 5 M.J. 390 (C.M.A. 1978). In this summary disposition, the Court of Military Appeals apparently ruled (Cook, Judge, dissenting) that off-base drug abuse, not violative of the law of any civil jurisdiction, was not subject to military jurisdiction despite Article 2, U.C.M.J., 10 U.S.C. § 802, jurisdiction over the accused. I regard that decision as an aberration, not even suggested by *O'Callahan*, and overruled *sub silentio* by *United States v. Trottier*, 9 M.J. 337 (C.M.A. 1980).

and that the accused should not be heard to complain for the first time on appeal.

Very seldom do we see a righteous protest at trial to the exercise of court-martial jurisdiction. Typically, the defense appears satisfied to stand trial in a court-martial, not contesting the exercise of jurisdiction, with full realization that a post-trial attack on the exercise of jurisdiction, if successful, will not likely result in a civilian prosecution in view of the passage of time and the likely change in location of the accused. I suggest that appellate courts ought not condone such tactics, and should refrain from considering issues not developed at trial. If there is a question as to the adequacy of the jurisdictional allegations, the proper forum to resolve it is the trial court. *United States v. Alef*, 3 M.J. 414, 419, notes 17–19 and accompanying text (C.M.A. 1977). Where the accused does not complain of the exercise of court-martial jurisdiction at trial, I believe we may, and ordinarily should, conclude that he decided it was not in his best interests to have some or all of the charges against him tried in the local civil courts.[4] In such circumstances the result is neither a waiver of jurisdictional requisites, nor a stipulation of jurisdiction, but rather, a waiver of the grand jury and petit jury entitlements purportedly secured by *O'Callahan v. Parker, supra.*[5]

II. *The Accused Would Not Have Benefitted by* O'Callahan's *Protection in a Civil Court.*

The stated purpose of the Supreme Court's decision in *O'Callahan, supra*, was to extend to members of the armed forces the Constitutional rights to indictment by grand jury and trial by petit jury for non "service-connected" offenses subject to trial in United States civil courts.[6] Pretermitting the underlying and ill-founded notion that courts-martial do not provide equivalent protection to an accused,[7] there is no point in giving jurisdictional priority to a civil court wherein the accused would not be afforded the protections upon which *O'Callahan* was premised.[8]

It is generally accepted that the United States civil courts referred to in *O'Callahan* include both federal and state courts. *But see, United States v. Borys*, 18 U.S.C.M.A. 547, 40 C.M.R. 259 (1969), at 263–64 (Quinn, Chief Judge, dissenting). In this case, the only civil courts having jurisdiction over the accused's forgery and larceny offenses are those created by the State of Texas, the situs of these transgressions.

Under the law of the State of Texas, the accused would be entitled to grand jury indictment only if the prosecution had elected to treat the offenses as felonies.[9] Had a

---

4. *United States v. Garcia*, 5 U.S.C.M.A. 88, 17 C.M.R. 88, 97 (1954). *See, United States v. Prather*, 18 U.S.C.M.A. 560, 40 C.M.R. 272 (1969), at 273–74 (Quinn, Chief Judge, dissenting). *See also*, notes 10 and 11, *infra*. By assenting to the exercise of military jurisdiction over his off-base offenses, the accused averted the possibility of *two* prosecutions—one in the Texas courts for the off-base larceny and forgery, and one in a court-martial for the other larceny and the disobedience offense.

5. *See*, note 8 and accompanying text, *infra*.

6. *See, e. g., United States v. Sharkey*, 19 U.S.C. M.A. 26, 41 C.M.R. 26, 27 (1969), and *Mercer v. Dillon*, 19 U.S.C.M.A. 264, 41 C.M.R. 264, 265 (1970).

7. *See, e. g.*, Quinn, *Some Comparisons Between Courts-Martial and Civilian Practice*, 15 U.C.L. A.L.Rev. 1240 (1968), and Moyer, *Procedural Rights of the Military Accused: Advantages Over a Civilian Defendant*, 22 Maine L.Rev. 105 (1970). Subsequent to the *O'Callahan* decision,

the Supreme Court itself observed that the UCMJ provisions for pretrial investigation offered an accused more valuable rights than provided by the indictment process. *Gosa v. Mayden*, 413 U.S. 665, 681, 93 S.Ct. 2926, 2936, 37 L.Ed.2d 873 (1973).

8. Ironically, if petitioner O'Callahan, a former sergeant in the United States Army, had been tried in the local civilian court at the time and location of his offenses, he would not have been entitled to indictment by grand jury or trial by petit jury. Section 83, Organic Act, An Act to Provide a Government for the Territory of Hawaii (Act of April 30, 1900, ch. 339, 31 Stat. 141).

9. The states are not required to provide a grand jury indictment procedure. *Hurtado v. California*, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884). By my recent count, less than half the states require grand jury indictment or presentment to precede the trial of non-capital offenses. Texas requires grand jury indictment

Texas prosecutor, as a matter of leniency to the accused, brought him to trial on nonfelony charges,[10] upon which he was not entitled to indictment by grand jury, would he later be heard to complain that he was denied an indictment by grand jury? This rhetorical question goes to the essence of the complaint on this review. The convening authority agreed to treat the accused's offenses as nonfelony by bringing him to trial before a special court-martial.[11] At that trial the accused did not complain that such act of leniency denied him his right to grand jury indictment, or investigation pursuant to Article 32, Uniform Code of Military Justice. This is understandable, because the only way the accused would have obtained a grand jury indictment or its military equivalent would have been by exposure to sentencing in Texas court on considerably more serious charges or in a military forum authorizing far greater maximum punishment.[12] Thus, I reject any notion that the accused was denied a constitutional right to indictment by grand jury. Under the circumstances presented here, he would not have been so entitled in a civil court.

I also find no basis for concluding that the accused was denied any right to trial by petit jury.[13] At his trial by court-martial, the accused pled guilty, maintaining that he was in fact guilty, and acknowledged that by his plea he intentionally waived numerous constitutional and statutory rights, including his right to a trial of the facts.[14] At a later point in the trial he also waived his right to sentencing by court members, and elected to be sentenced by the military judge alone.[15] On the facts before us, including the accused's guilty plea and waiver of court members, I find no basis for concluding that the accused was denied any right to a jury trial.

In conclusion, I concur with Senior Judge Arrowood's finding that the off-base offenses were "service-connected." I also believe that (1) regardless of "service-connection," the failure to object at trial to the exercise of subject matter jurisdiction for offenses cognizable by the punitive articles of the UCMJ should normally preclude appellate attack on the factual allegations and conclusions supporting the exercise of court-martial jurisdiction, and (2) regardless of "service-connection," where the accused would not have been afforded indictment or trial by jury in any civil court in the United States, exercise of court-martial jurisdiction is appropriate.

preceding the trial of felonies, but misdemeanors may be prosecuted upon information filed by the county attorney or upon affidavit. Article 5, Section 17, Texas Constitution.

10. Forgery is a Third Degree felony, Texas Penal Code, § 32.21(d), but the offense could have been charged as a "false statement to obtain property or credit," which is a Class A misdemeanor. Texas Penal Code, § 32.32(a)(1).

11. The accused offered to plead guilty in exchange for the convening authority's promise to refer the case to a special court-martial, rather than a general court-martial.

12. As a result of the pretrial agreement, note 10, *supra*, the maximum sentence was reduced from a Dishonorable Discharge, confinement at hard labor for 6 *years*, and total forfeitures, to a Bad Conduct Discharge, confinement at hard labor for 6 *months*, and forfeiture of two-thirds pay for six months.

13. As to trial by jury, it has been cogently observed that "the composition of a court-martial is for a member of the armed forces more

nearly a jury of his peers than is a civilian panel in a State where the member may be involuntarily stationed." *Mercer v. Dillon, supra*, at 266.

14. "How could it be argued that he has been subjected to an unfair trial on the issue of his guilt?" *Mercer v. Dillon, supra*, at 268.

15. This election corresponds to that which would have been available to the accused in a misdemeanor prosecution in county court in Texas. Article 37.07(2)(b), Texas Code of Criminal Procedure. The accused here did not initially request trial by military judge alone, but, as a result of the court members' inability to agree upon a sentence, the military judge declared a mistrial for sentencing. At a subsequent proceeding, referred to a different court-martial, the accused requested, and the military judge approved, sentencing by military judge alone. *United States v. Norris*, 43 C.M.R. 1000 (A.F.C.M.R. 1971), is distinguishable in view of the unusual bifurcation of the trial in this case.

MILLER, Judge (concurring):

While Senior Judge Arrowood's opinion precisely states my position insofar as it goes, it simply does not go far enough.

I emphatically agree with the lead opinion's implicit acknowledgement that by publishing *United States v. Trottier,* 9 M.J. 337 (C.M.A. 1980), the United States Court of Military Appeals (C.O.M.A.), effectively unyoked the military justice system from the harness that Court had created by its earlier decisions, preventing military courts from considering all but twelve of the numerous jurisdictional considerations specifically legitimatized for use by military courts in the United States Supreme Court cases of *Relford v. Commandant,* 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971), and *Schlesinger v. Councilman,* 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975).

What I object to is that, once having reached this conclusion, my brother was unwilling to freely apply the considerations he had acknowledged were resurrected. Instead, he penuriously applied only those resurrected considerations that were least inconsistent with the principles of COMA's pre-*Trottier,* jurisdictional holdings; holdings that clearly had been premised in part upon the sanctity of the very restrictions he had just found to be invalid.

While I appreciate my brethren's exercise of conventional wisdom in declining to "rush in" the door "cracked" by *Trottier, supra,* it is my personal conviction that previous jurisdictional decisions now made dubitable by *Trottier, supra,* have already seriously impacted upon the disciplinary effectiveness of our fighting forces. Consequently, I am compelled to disregard such conventional wisdom in this instance, even at the risk of stultification.

In my view, *Trottier, supra,* not only invalidated restrictive principles of COMA's previous interpretations of *O'Callahan v. Parker,* 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), *Relford, supra, Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), and *Councilman, supra,* but, also, manifestly signaled COMA's desire to reconsider all of its previous jurisdic-

tional decisions based upon such unduly restrictive principles. Consequently, until COMA expressly reaffirms jurisdictional decisions it made from *United States v. Uhlman,* 1 M.J. 419 (C.M.A. 1976), until *Trottier, supra,* I view each of them to be without further precedential value.

In the case at bar, the accused's military status clearly facilitated the deception of his intended victim and permitted him to achieve his desired goal. Additionally, a fellow airman suffered an apparent legal prejudice by being named debtor on the loan negotiated by the accused and stood to suffer the possible consequences, both military and civilian, flowing from the accused's act. Either of these factors alone is clearly sufficient to make his offense "service-connected" within the meaning given that term by *O'Callahan, supra,* even prior to the more expansive definitions later superimposed upon the term's use by *Relford, supra,* and *Councilman, supra. See, United States v. Morisseau,* 19 U.S.C.M.A. 17, 41 C.M.R. 17 (1969), *United States v. Peak,* 19 U.S.C.M.A. 19, 41 C.M.R. 19 (1969), *United States v. Frazier,* 19 U.S.C.M.A. 40, 41 C.M.R. 40 (1969), *United States v. Rego,* 19 U.S.C.M.A. 9, 41 C.M.R. 9 (1969), and *United States v. Camacho,* 19 U.S.C.M.A. 11, 41 C.M.R. 11 (1969).

Having emphasized these two specific "service connections," which I view as wholly determinative, however, I would go much further. I would add to the bases of service connection enumerated in the lead opinion additional individual factors which, when combined with the military status of the accused, I would view as sufficient in and of themselves to satisfy the requirement of "service-connection" as expanded by the Supreme Court decisions subsequent to *O'Callahan, supra.* In doing so, I would interpret the last sentence of the quote from *Councilman, supra,* contained in the lead opinion as a recognition on the part of the Supreme Court that military courts possess sufficient military expertise to take judicial notice of the effect of particular acts of misconduct on the factors and considerations it has deemed to be relevant to the question of "service connection."

My first additional basis for establishing jurisdiction would rest upon the well known fact that civilian communities are generally reluctant to prosecute first offenders for offenses involving losses of a "mere $100.00" when the offender is already the subject of a court-martial at a near-by military installation for a closely related offense. Resultantly, if the military failed to try the off-base offenses here, it is unlikely that they would be tried at all because it is doubtful that civilian courts whose principal concerns are other than the vindication of military disciplinary authority would in reality be present and available for prosecution of two off-base offenses such as confront us here.[1]

Secondly, I would find that the off-base offenses here are so closely related to the on-base theft, as to give the court-martial "pendant" jurisdiction over the offenses, even if it would not otherwise have exercised such jurisdiction. In simple point of fact, I conclude that failing to try the related off-base offense together with the on-base theft, because of "the presence and availability of a civilian court in which the case could be prosecuted,"[2] would violate military justice concepts, favorable to the accused. In the absence of such a procedure, if the accused were to be tried at all for the related off-base offenses,[3] he would be subjected to two trials for what is essentially one criminal scheme. Not only would such a result be prejudicial to the offender in terms of emotional stress and probable sentencing, but it would be contrary to the interests of overall judicial economy.[4]

Third, as a result of my second additional finding, I would find that the apparent unfairness inherent in a system requiring two separate trials for offenses growing out of one criminal scheme further contributes to still existing perceptions among some military personnel of an "unjust" Military Code.[5] Unless there is rectification, the result will be a continuing denigration of military morale and effectiveness.[6]

Fourth, and finally, I would point out the ultimate consequences of a jurisdictional scheme which creates the apparent conflict between my first and second additional findings. Without some sort of "pendant" or "forum convenience" concept recognized by military courts as applicable to jurisdictional determinations, there can be no expectation of uniform treatment of servicemen as to combination on and off-base offenses throughout the respective states. Such designed uncertainty as to the consequences of a service member's actions, depending as it does solely on the whims of local communities to which service members happen to be assigned, is wholly inimicable to the continuing goals of uniformity in military justice. If, as the drafters of this Code perceived, concrete expectations of uniform punishment for deviant behavior are essential to the maintenance of military discipline, this particular enigma should not, and need not, be tolerated.

In closing, I note that in the lead opinion, Senior Judge Arrowood mentions the accused's military status as a factor in determining military jurisdiction. I view this recognition, tacit though it may be, as significant. For, although, as he notes, the Supreme Court in *O'Callahan, supra, et al.*, indicated status alone is insufficient to vest jurisdiction in the Military Justice system when weighed against the *Relford, supra,* and *Councilman, supra,* factors, it, nevertheless, undeniably goes a long way toward establishing such jurisdiction.

1. *See Relford v. Commandant*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971), consideration (e) and seriatim factor (8).

2. *See Relford, supra,* seriatim factor (8).

3. As noted ... the discussion of my first additional finding such a prosecution is unlikely, but possible.

4. *See* Judge Cook's concurring opinion in *United States v. Roberts*, 4 M.J. 91 (C.M.A. 1977), Manual for Courts-Martial, 1969, (Rev.), paragraph 33–h, and the criteria from *Schlesinger v. Councilman*, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975) quoted herein.

5. *See* D.O.D. Report of the Task Force on the Administration of Military Justice in the Armed Forces (30 November 1972).

6. *See Relford, supra,* consideration (c).

Viewing military status of an offender in light of the *Relford, supra,* and *Councilman, supra,* jurisdictional criteria, I find it relevant because: (a) the military commander has inherent responsibility for the maintenance of order in his command and authority to maintain that order; (b) the conviction that Article I, § 8, Cl. 14, vesting in the Congress the power "To make Rules for the Government and Regulation of the land and naval forces," means, in appropriate areas beyond the purely military offense, more than the mere power to arrest a serviceman-offender and turn him over to the civil authorities; (c) the distinct possibility that civil courts, particularly non-federal courts, will not have an overriding interest, concern and capacity for all cases that vindicate the military's disciplinary authority within its own community; (d) the misreading and undue restriction of *O'Callahan, supra,* if interpreted so as to confine the court-martial to the purely military offense that has no counterpart in nonmilitary law; and (e), more generally, the direct impact that off base criminal offenses have on military discipline and effectiveness, which cannot be properly vindicated by the often inconsistent decisions of officials in various civilian communities who are not sensitive to the requirements of instilling in military members implicit obedience to orders of command.

Commission of any felony offense unquestionably has the effect of denigrating the pride possessed by other members of an accused's unit in the behavior and disciplinary status of that unit. Additionally, and in a far wider perspective, if the military lacks jurisdiction over such a "major" offense, it detrimentally affects accountability for the servicemember's actions to his commander. When justice decisions are removed from the hands of the military commander and action, if any, is left to the option of local civilian communities, it is clear the commander's task of maintaining discipline or effectuating unquestioning obedience of his people's whole beings to competent orders is adversely impacted. Only when it is realized that effectuating such obedience remains at the heart of cre-

ating an effective fighting force, does the factor of military status begin to assume its proper proportion in the determination of the "service connection" upon which jurisdiction is now based.

In my view, a fair reading of the Supreme Court cases in the area establishes that the military status of the offender is so significant that when combined with any one of the other findings I have alluded to herein, it amply provides the requisite "service connection" necessary for military jurisdiction in this case.